103   641
.105   463

## BOARD OF EDUCATION etc. *v.* CUMMING *et al.*

1. The county board of education of Richmond county has the discretionary power, under the law, of establishing or discontinuing high schools at such points in the county as the interests and convenience of the people may require.

2. Under the facts of this case, there was no abuse of such discretion by the county board in discontinuing the high school established for the colored race, although it left in operation a similar school for white females, and contributed to the support of a high school for white boys and girls, which, however, it had not established.

3. The provisions of the act "to regulate public instruction in the County of Richmond," approved August 23, 1872, investing the county board of education of Richmond county with the powers above designated, are not violative of any provision of the constitution of this State or of the United States.

Argued January 24, 25, — Decided March 23, 1898.

Petition for injunction. Before Judge Callaway. Richmond county. December 22, 1897.

*Ganahl & Ganahl, Frank H. Miller* and *W. K. Miller,* for plaintiff in error.
*Salem Dutcher, Hamilton Phinizy* and *J. S. Reynolds,* contra.

SIMMONS, C. J. By an act approved August 23, 1872, a board of education was established for the County of Richmond. By the provisions of the act, this board was composed of three freeholders from each militia district, three from each ward in

the City of Augusta, and three from each incorporated town or village, other than the City of Augusta, in the county. The act further provided that this board should meet and organize by electing one of their number as president and by electing a secretary. It gave this board power to employ teachers and to prescribe their qualifications. It provided that a certain part of the general school fund should be paid over to the board, and authorized the board to levy such tax as it might deem necessary for public-school purposes. It made it the duty of the tax-collector of the county to collect the tax and to deposit it to the credit of the board. The act also made the members of the board from each militia district and from each ward of the city trustees of the school of that militia district or city ward. In general, it provided for a thorough system of public schools in the county. The tenth section of the act reads as follows: "And be it further enacted, That the county board of education may establish schools of higher grade at such points in the county as the interest and convenience of the people may require, which schools shall be under the special management of the board at large, who have full power in respect to such schools; to employ, pay and dismiss teachers; to build, repair and furnish the schoolhouse or houses; purchase or lease sites therefor, or rent suitable rooms, and make all other provisions relative to such schools as they may deem proper. The funds for such purposes shall be deducted ratably from the quota apportioned to the respective school districts. And the county board of education shall have full power and authority to charge such sums for tuition and incidental expenses in said schools of higher grades as the board, from time to time, may fix and determine." (This last sentence was added as an amendment, February 22, 1877.) In pursuance of this act, the board established a high school for girls in the year 1876, and in 1878 a Mrs. Tubman presented the board with a lot and building for the purpose of affording a higher education to the young women of the county. The board fixed the rate of tuition in this school at $15.00 per annum for residents of the county, under authority of the act of 1877, amending the act of 1872. In 1880 the board established the Ware High School for

the colored race, and fixed the rate of tuition at $10.00 per annum. In 1897 the board, ascertaining that it had not funds sufficient to carry on the colored high school and at the same time afford school privileges to some 400 colored children in the primary schools, after consultation among themselves and the patrons of the colored high school, determined to suspend the Ware High School for the time.

Cumming and others thereupon filed their equitable petition against the board of education and the tax-collector, seeking to enjoin the collection of that portion of the tax levied for school purposes which was for the support of the Tubman High School, and another high school in the county which had been established by the Baptist denomination and to which the board had made a small appropriation for that year. They alleged that such tax was illegal and void, because the system of high schools now in operation is for the use and benefit of the white school population exclusively, and the board is not authorized by law to levy, or the tax-collector to collect from the taxpayers of the county, any tax for the support of any system of high schools wherein the colored school population can not have the same educational facilities as the white school population; that the board is now using the funds on hand, and intends to use the tax levied, for the support of the white high schools to the entire exclusion of the colored high school. Petitioners are persons of color, and represent children of school age who are lawfully entitled to the full benefit of any system of high schools organized and maintained by the board of education, and by suspending the colored high school they are wholly debarred from any participation in the benefits of a high-school education although they are being taxed therefor. They rely upon so much of the constitution of the United States as declares that no State shall deny to any person within its jurisdiction the equal protection of the laws, and aver that the action of the board is a denial of the equal protection of the laws; and that it is inequitable, unlawful and unconstitutional for the board to levy upon petitioners, or for the tax-collector to collect from them, any tax for educational purposes, from the benefits of which petitioners, in the persons of their

children of school age, are excluded and debarred. The defendants demurred to the petition, and also filed an answer in which they denied that they had established any system of high schools in the county, and alleged that the act of 1872 did not make it the duty of the board, nor had it authority under the organic law, to establish such system. The board claimed that under the tenth section of the act (recited above) it had the discretion to establish high schools at such points in the county as the interests of the people might require, and that in pursuance of that authority it had established the above-mentioned schools. Upon the hearing, the court below sustained the demurrer of the tax-collector, overruled the demurrer of the board of education, and enjoined the board from using, for the support and operation of the white school, any of the funds or property now in its hands, or hereafter to come into its hands, for educational purposes, until the board shall provide or establish for such colored children of high-school grade in the county as may desire a high-school education, equal facilities in high-school education as are now maintained for white children. The court held that "the establishment and maintenance of schools of higher grade than common schools, authorized by section 10 of the act [of 1872], is a matter that rests exclusively in the sound discretion of the board. But if the discretion is exercised in the establishment [of such schools] and [they are] maintained in harmony and in compliance with section 9 of said act, the board must provide the same facilities for the higher education of both races." The defendants excepted to the ruling of the court and bring the case here for review.

1, 2. The act of 1872, incorporating the board of education of Richmond county, made it a public corporation and conferred upon it certain powers of government, mainly those of establishing public schools and levying and collecting a tax for their support. It made it compulsory upon the board to establish free common schools, but gave it a broad discretion in establishing high schools. It declared that the county board of education might establish schools of higher grade than common schools at such points in the county as the interests and

convenience of the people might require. It left it solely with
the board to determine whether or not it would establish high
schools. It could establish one for females and none for males,
or vice versa, — it could establish a white high school and pro-
vide none for the blacks, or vice versa, — if the "interest and
convenience of the people" required that they should do so.
The matter is left to their discretion, and that discretion is a
power "conferred upon them by law of acting officially in cer-
tain circumstances according to their own judgment and con-
science, not controlled by the judgment or conscience of others."
The powers conferred are legislative in their character. If,
therefore, this corporate body was of the opinion that the in-
terests of the people required it, it had a right to suspend the
operation of the colored high school and appropriate the fund
which had previously gone to that school to the primary schools.
It could do so, if, in the judgment of its members, it was better
for the interests of the people that 400 colored children should
obtain the elements of a common-school education than for fifty
or sixty colored children to receive the advantages of a high-
school education. And in the exercise of their discretion, they
could consider the fact that these negro children of high-school
age had access to some three private schools of that grade, where
the tuition was less than it had been at the Ware High School
and less than the tuition charged the white high-school children.
The board was not given authority to establish a *system* of high
schools, but to establish individual schools in their discretion.
We think that they were certainly not required to establish a
high school for negroes whenever they established one for
whites. It may be, and probably is, true that the number of
white children prepared for a high-school course is greater than
the number of negro children prepared for such course. If one
school will accommodate all of the negro pupils of high-school
grade, while it takes five schools to accommodate the white
children of similar grade, must the board establish five high
schools for each race merely because the whites require that
number? Certainly here it must be allowed a broad discre-
tion. We do not mean to intimate that any public corporation
of this kind can arbitrarily and without reason establish one

school and suspend another; but where it is in its discretion to pass upon facts and determine from them the best interests of the people. at large, courts will not control its discretion .unless it is manifestly abused, although .the court may be of the opinion that the corporation erred upon the facts.

But it is claimed that the board had no discretion in this matter and that its duties were fixed by the preceding (the ninth) section of the act. ˙ That section reads as follows: "And be it further enacted, that the county board of education, under the advice and assistance of the trustees in each ward or school district, shall make all the necessary arrangements for the instruction˙ of the white and colored youths in separate schools. They shall provide the same facilities for each, both as regards schoolhouses and fixtures, attainments and abilities of teachers, length of term time, and all other matters pertaining to education ; but in no case shall white and colored children be taught together in the same school." It will be observed from a reading of this section, that the board acts upon the advice ˙and assistance of the trustees in each ward or school district, and that, upon this advice and assistance, the board "shall make all˙the necessary arrangements for the instruction of the white and colored youths in separate schools." This section gives the board no discretion. It is compulsory upon it to establish proper arrangements to educate the children of both races, and to provide the same facilities for each as to schoolhouses, fixtures, and the various other matters pertaining to education. This ninth section relates, in our opinion, entirely to the common schools, and not to the matter of high schools. It does not control the board in the exercise of its discretion under the tenth section. That section relates to different and independent schools. The ninth section does not contemplate a system of high schools, as contended for by defendants in error. The schools to be established under the tenth section are separate from and independent of those established under the preceding section. They were not to be free schools, as contemplated in the other sections of the act, but the pupils were required to pay tuition. It is, therefore, not a free high school. For these reasons and under the facts disclosed by the

record, we think that the board of education did not abuse its discretion in discontinuing the high school established for the colored race.

3. It is claimed in the petition that if the action of the board of education is authorized by the tenth section of the act of 1872, it is in violation of the constitution of the United States and of this State. What provision of the constitution of this State is violated is not stated either in the petition or in the brief of counsel. We know of no provision of the State constitution which is violated by the action of the board. It is claimed that this action is in violation of the 14th amendment to the constitution of the United States. This point in the case was not argued before us by the learned counsel for the defendant in error, either orally or by brief, the only mention made of it in his brief being at the conclusion, where he says: "To deny the colored school population of Richmond county the equal protection of the educational laws of force in that county is to violate not only the State law, but the constitution of the United States—fourteenth amendment." He cites no authority to sustain this contention. He does not point out in his brief which paragraph of the fourteenth amendment is violated. If it be the first, he does not point out which clause of that paragraph is violated, whether the privileges or immunities of citizens of the United States are abridged, whether his clients are deprived of life, liberty, or property without due process of law, or whether his clients are denied the equal protection of the laws. It is difficult, therefore, for us to determine whether this amendment has been violated. If any authority had been cited, we could from that have determined which paragraph or clause counsel relied upon; but as he has left us in the dark, we can only say that in our opinion none of the clauses of any of the paragraphs of the amendment, under the facts disclosed by the record, is violated by the board. There is no complaint in the petition that there is any discrimination made in regard to the free common schools of the county. So far as the record discloses, both races have the same facilities and privileges of attending them. The only complaint is that these plaintiffs, being taxpayers, are debarred of the privilege of sending their

children to a high school which is not a free school but one where tuition is charged, and that a portion of the school fund, raised by taxation, is appropriated to sustain white high schools to which negroes are not admitted.

We think we have shown that it was in the discretion of the board to establish high schools. It being in their discretion, they could, without a violation of the law or of any constitution, devote a portion of the taxes collected for school purposes to the support of this high school for white girls and to assist a country denominational high school for boys. In our opinion, it is impracticable to distribute taxes equally. The appropriation of a portion of the taxes for a white girls' high school is not more discrimination against these colored plaintiffs than it is against many white people in the county. A taxpayer who has boys and no girls of a school age has as much right to complain of the unequal distribution of the taxes to a girls' high school as have these plaintiffs. The action of the board appears to us to be more a discrimination as to sex than it does as to race. While the board appropriates some money to assist a denominational school for white boys and girls, it has never established a high school for white boys; and if the contention of these plaintiffs is correct, white parents who have boys old enough to attend a high school have as much right to complain as these plaintiffs, if they have not more. Without, therefore, going into an analysis of the different clauses of the fourteenth amendment of the constitution of the United States, we content ourselves by saying that, in our opinion, the action of the board did not violate any of the provisions of that amendment. It does not abridge the privileges or immunities of citizens of the United States, nor does it deprive any person of life, liberty, or property without due process of law, nor does it deny to any person within the State the equal protection of its laws.

*Judgment reversed.    All the Justices concurring.*